# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### ST. JOSEPH DIVISION

| | | |
|---|---|---|
| **ROBERT GLEN MYERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.:** |
| | ) | |
| | ) | |
| **LAMBERT'S CAFE III, INC.** | ) | |
| **For Profit Corporation** | ) | **INJUNCTIVE RELIEF SOUGHT** |
| **d/b/a LAMBERT'S CAFE** | ) | |
| | ) | |
| | ) | |
| **Defendant(s).** | ) | |
| | ) | |

## COMPLAINT

Plaintiff, ROBERT GLEN MYERS (hereinafter "MYERS"), by and through the undersigned counsel, hereby files this Complaint and sues LAMBERT'S CAFE III, INC., For Profit Corporation, d/b/a LAMBERT'S CAFE ("Defendant"), for declaratory and injunctive relief pursuant to 28 U.S.C. §§2201 and 2202, attorneys' fees, litigation expenses, costs (including, but not limited to, court costs and expert fees) for unlawful disability discrimination pursuant Title III of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. §§ 12181-12189 ("ADA"), and the regulations implementing the ADA set for in 28 C.F.R. Part 36, et seq, and alleges as follows:

1.      This action arises from Defendant's failure to make Defendant's online platform located at www.throwedrolls.com (hereinafter "Defendant's Website") compatible with screen access software, thereby denying blind individuals, including MYERS, full and equal access to Defendant's products and services.

2. MYERS files this lawsuit because Defendant's policies exclude him—and millions of other potential consumers—from fully and equally enjoying Defendant's products and services.

3. Accordingly, MYERS seeks an order requiring that Defendant make Defendant's Website accessible and adopt sufficient policies and practices to ensure the Defendant's Website does not become inaccessible again in the future.

## JURISDICTION AND VENUE

4. This Court is vested with original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and to 28 U.S.C. §1343 for Plaintiff's claims arising under Title 42 U.S.C. §§ 12181-12189, based on Defendant's violations of Title III of the ADA. *See also,* 28 U.S.C. §§ 2201, 2202, as well as the 2010 ADA Standards.

5. Venue is proper in this Court, St. Joseph Division, pursuant to 28 U.S.C. § 1391(B) and Internal Operating Procedures for the United States District Court of the Western District of Missouri in that a substantial part of the acts and omissions giving rise to MYERS's claims occurred in Caldwell County, Missouri.

6. Defendant attempts to and indeed does, participate in Caldwell County's economic life by offering and providing products and services over the internet to Caldwell County's residents, including MYERS. Defendant purposefully avails itself of the benefits and advantages of operating an interactive, online business open 24-hours a day, 7-days a week, 365-days a year to Caldwell County residents. Indeed, upon information and belief, Defendant places cookies on computers and other electronic devices physically located throughout Missouri every time a Missouri resident visits Defendant's Website.

7.     Further, Defendant operates a Principal Place of Business with a physical address of 1800 W. State Highway J, Ozark, MO 65721 (hereinafter "Defendant's Principal Place of Business").

8.     MYERS was injured when he attempted to access the Digital Platform and encountered communication barriers that denied him full and equal access to Defendant's online products, content, services, and other information that Defendant is interested in communicating/offering to its customers.

## PARTIES

9.     MYERS is a natural person over the age of 18 and is blind.

10.     MYERS is *sui juris* and is a resident of the State of Missouri residing in Hamilton, Missouri, located in Caldwell County.

11.     MYERS is disabled as defined by the ADA and is therefore a member of a protected class under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12102(2), and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 et seq. More specifically, MYERS is legally blind from age-related macular degeneration[1], and therefore is substantially limited in performing one or more major life activities, including but not limited to accurately visualizing his world. As a result of his visual impairment, MYERS uses screen access software to access digital content, like text messages, emails, and websites.

12.     MYERS cannot use his computer without the assistance of appropriate and available auxiliary aids, screen reader software, and other technology and assistance. Screen reader software translates the visual internet into an auditory equivalent. At a rapid pace, the software

---

[1] The term "blind" or "blind person" as used throughout this complaint refers to persons with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200. Some blind people who meet this definition have limited vision, whereas others have no vision.

reads the content of a webpage to the user. As explained in the Eastern District of New York

holding of *Andrews v. Blick Art Materials, LLC*:

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be 'clicked,' which will bring him to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand. The screen reading software uses auditory -- rather than visual -- cues to relay this same information. When a sight impaired individual reaches a link that may be 'clicked on,' the software reads the link to the user, and after reading the text of the link says the word 'clickable.'...Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with his keyboard.

*Andrews v. Blick Art Materials, LLC*, 286 F.Supp.3d 365, 374 (E.D.N.Y.2017).

13.     MYERS' blindness limits him in the performance of major life activities, including

sight, and he requires assistive technologies, auxiliary aids, and services for effective

communication, including communication in connection with his use of a computer.

14.     MYERS frequently accesses the internet. Due to blindness, to effectively

communicate and comprehend information available on the internet and thereby access and

comprehend websites, MYERS uses commercially available screen reader software to interface

with the various websites.

15.     Defendant is For Profit Corporation with a principal place of business of 1800 W.

State Highway J, Ozark, MO 65721  (hereinafter "Defendant's Principal Place of Business").

16.     Defendant operates at Defendant's Principal Place of Business. Defendant is known

for hearty, Southern-style comfort food. Defendant also features an RV Park at Defendant's

Principal Place of Business for travelers looking to rest and enjoy a meal. Additionally, Defendant

offers a wide selection of merchandise. In order to access, research, or purchase Defendant's

products and services, consumers may visit Defendant's online store located at Defendant's Website

17.     Defendant owns, operates, maintains, and/or controls Defendant's Website and is responsible for the policies, practices, and procedures concerning Defendant's Website development and maintenance.

18.     Defendant's Principal Place of Business is also open to the public. As such, it is a Place of Public Accommodation subject to the requirements of Title III of the ADA and it's implementing regulation as defined by 42 U.S.C. §12181(7)(B), §12182, and 28 C.F.R. §36.104(2). Defendant's Principal Place of Business are also referenced as "place of public accommodation".

19.     Defendant's Website functions as a vital extension of Defendant's Principal Place of Business by offering comprehensive services and information that mirror its physical operations. Defendant's Website provides detailed descriptions of key menu items, enabling customers to explore the culinary offerings available at Defendant's Principal Place of Business. Additionally, it facilitates product accessibility by allowing users to purchase merchandise such as apparel, hats, and preserves directly online, thereby extending the retail aspect of the business beyond Defendant's Principal Place of Business. Furthermore, Defendant's Website lists business hours and contact information, ensuring that customers can seamlessly transition between online inquiries and in-person visits. By integrating these elements, Defendant's Website effectively operates as a digital counterpart to the Defendant's Principal Place of Business, reinforcing the legal nexus between the two.

20.     At all times material hereto, Defendant was and still is an organization owning, operating, and/or controlling Defendant's Website. Since Defendant's Website is open to the

public through the internet, by this nexus Defendant's Website is an intangible service, privilege, and advantage of Defendant's Principal Place of Business that must comply with all requirements of the ADA, must not discriminate against individuals with visual disabilities, and must not deny those individuals the same full and equal access to and enjoyment of the goods, services, privileges, and advantages as are afforded the non-visually disabled public both at Defendant's Website and in Defendant's Principal Place of Business. As such, Defendant has subjected itself and Defendant's Website to the requirements of the ADA.

## FACTUAL AND SUBSTANTIVE ALLEGATIONS

21.     MYERS is and has been a customer who is interested in patronizing and intends to patronize in the near future once Defendant's Website's access barriers are removed or remedied, Defendant's Principal Place of Business.

22.     The Defendant operates through Defendant's Website. Defendant's Website serves as a digital extension of the Defendant's Principal Place of Business, providing information on dining options, popular menu items, and additional services such as RV Park accommodations. Defendant's Website also facilitates customer engagement through merchandise sales and order placements. Defendant's Website is inherently linked to the Defendant's Principal Place of Business activities conducted at Defendant's Principal Place of Business, thereby establishing a legal nexus between the Defendant and Defendant's Website.

23.     Defendant's Website is additionally used to search for brick-and-mortar store locations, check Defendant's store hours and offerings, pricing, purchasing, and sign up for electronic mailers to receive offers, benefits, exclusive invitations, and discounts for use at Defendant's Website or in Defendant's Principal Place of Business.

24.     The opportunity to shop and pre-shop Defendant's offerings available for purchase in Defendant's Principal Place of Business and sign up for an electronic mailer to receive offers, benefits, exclusive invitations, and discounts for use in Defendant's Principal Place of Business from his home are important accommodations for MYERS because traveling outside of his home as a visually disabled individual is often a difficult, hazardous, frightening, frustrating and confusing experience. Defendant has not provided its business information in any other digital format that is accessible for use by blind and visually impaired individuals using the screen reader software.

25.     Like many consumers, MYERS accesses numerous websites at a time to compare offerings, prices, sales, discounts, events, and promotions. MYERS may view several dozen websites to compare features, discounts, promotions, and prices.

26.     MYERS utilizes screen reader software that allows individuals who are visually disabled to communicate with websites. However, Defendant's Website contains access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

27.     On or about the following dates, MYERS attempted to utilize Defendant's Website:

a.      March 13, 2025;

b.      March 26, 2025; and

c.      June 23, 2025.

(hereinafter "MYERS' Website Visits"). During MYERS' Website Visits, MYERS experienced substantial access barriers and, thus, was denied fair and equal access to same. MYERS was attempting to browse the offerings and online offers to educate himself as to the offerings, sales,

discounts, and promotions being offered, and with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

28.     While notice to Defendant is not required, MYERS sent a pre-suit communication on March 26, 2025. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

29.     Prior to initiating suit, but following the sending of the pre-suit communications, MYERS has continued to attempt to utilize Defendant's Website during MYERS' Website Visits to browse and educate himself as to the offerings, sales, discounts, and online promotions, with the intent of making a purchase through Defendant's Website or at Defendant's Principal Place of Business.

30.     However, Defendant's Website continues to contain access barriers that prevent free and full use by visually disabled individuals using keyboards and available screen reader software.

## VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT

31.     MYERS adopts and re-alleges the allegations stated in paragraphs 1 through 30 above as if fully stated herein.

32.     On July 26, 1990, Congress enacted the Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12101 et. seq. Commercial enterprises were provided one and a half (1.5) years from enactment of the statute to implement its requirements. The effective date of Title III of the ADA was January 26, 1992, or January 26, 1993, if Defendant(s) have ten (10) or fewer employees and gross receipts of $500,000.00 or less. *See* 42 U.S.C. § 12182; 28 C.F.R. § 36.508(a).

33.     Congress found, among other things, that:

a.  some 43,000,000 Americans have one or more physical or mental disabilities, and this number shall increase as the population continues to grow older;

b.  historically, society has tended to isolate and segregate individuals with disabilities and, despite some improvements, such forms of discrimination against disabled individuals continue to be a pervasive social problem, requiring serious attention;

c.  discrimination against disabled individuals persists in such critical areas as employment, housing, public accommodations, transportation, communication, recreation, institutionalization, health services, voting and access to public services and public facilities;

d.  individuals with disabilities continually suffer forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, failure to make modifications to existing facilities and practices. Exclusionary qualification standards and criteria, segregation, and regulation to lesser services, programs, benefits, or other opportunities; and,

e.  the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our country is justifiably famous, and accosts the United States billions of dollars in unnecessary expenses resulting from dependency and non-productivity.

42 U.S.C. § 12101(a)(1)-(3),(5) and (9).

34.  Congress explicitly stated that the purpose of the ADA was to:

a.   provide a clear and comprehensive national mandate for elimination of discrimination against individuals with disabilities;

b.   provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; and

c.   invoke the sweep of congressional authority, including the power to enforce the Fourteenth Amendment and to regulate commerce, in order to address the major areas of discrimination faced on a daily basis by people with disabilities.

U.S.C. § 12101(b)(1)(2) and (4).

35.    Section 302(a) of Title III of the ADA, 42 U.S.C. § 12101 et seq., provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

36.    "Congress passed the ADA in 1990 to fix a serious problem—namely, the seclusion of people with disabilities resulting in explicit and implicit discrimination. . . . The disabled population hoped that, as a result of the ADA, their lives would no longer be shaped by limited access and the inability to choose. . . . However, reality—a lack of compliance with the ADA and severe underenforcement of the statute—soon destroyed this hope."[2]

---

[2] Kelly Johnson, *Testers Standing up for the Title III of the ADA*, 59 Cas. W. Res. L. Rev. 683, 684 (2009), http://scholarlycommons.law.case.edu/caselrev/vol59/iss3/6 (citing H.R. REP. No. 101-485, pt. 2, at 28-29 (1990); Elizabeth Keadle Markey, *The ADA's Last Stand?: Standing and the Americans with Disabilities Act*, 71 Fordham L. Rev. 185 (2002) (arguing for a more lenient standard for standing under the ADA); and Samuel R. Bagenstos, *The Perversity of Limited Civil Rights Remedies: The Case of "Abusive" ADA Litigation*, 54 UCLA L. Rev. 1, 3 (2006) (discussing the need for private enforcement in Title III)).

37.     More than thirty years "after the passage of the ADA, numerous facilities are still not compliant leaving the disabled population in a second-class citizenship limbo. Title III of the ADA allows both the U.S. Attorney General[3] and private individuals[4] to sue, but the rate at which [ ] the Attorney General [is] bringing suit seeking compliance is extremely low. The Department of Justice's Disability Section, tasked with ADA enforcement, is understaffed[.]"[5]

38.     Thus, "private suits by necessity represent the main tool for ensuring compliance with Congress' intent in passing the ADA,"[6] most of which suits "are brought by a small number of private plaintiffs who view themselves as champions of the disabled."[7]

39.     The U.S. Department of Justice ("DOJ") supports this dynamic, recognizing that because it "cannot investigate every place of public accommodation," "[p]rivate plaintiffs play an important role in enforcing the ADA[.]"[8]

40.     Consistent with these policies, MYERS files this case to ensure Defendant provides full and equal access to the goods and services that Defendant offers to the public from Defendant's Principal Place of Business and/or physical facilities.

41.     Defendant's Principal Place of Business and Defendant's Website are public accommodations within the definition of Title III of the ADA, 42 U.S.C. § 12181(7).

---

[3] 42 U.S.C. § 12188(b).
[4] 42 U.S.C. § 12188(a).
[5] Johnson, *supra* note 8.
[6] *Betancourt v. Ingram Park Mall*, 735 F. Supp. 2d 587, 596 (W.D. Tex. 2010).
[7] *Id.* (*quoting Molski v. Evergreen Dynasty Corp.*, 500 F.3d 1047, 1062 (9th Cir. 2007)); *D'Lil v. Best Western Encina Lodge & Suites*, 538 F.3d 1031, 1040 (9th Cir. 2008).
[8] Statement of Interest of the United States of America, *ERC v. Abercrombie & Fitch Co.*, No. 1:09-cv-03157 (D. Md.), ECF No. 38, at *1 (July 6, 2010); *See also Hensley v. Eckerhart*, 461 U.S. 424, 445 (1983) ("All of these civil rights laws depend heavily upon private enforcement, and fee awards have proved an essential remedy if private citizens are to have a meaningful opportunity to vindicate the important Congressional policies which these laws contain.").

42.     There is a physical nexus between Defendant's Website and Defendant's Principal Place of Business in that Defendant's Website provides contact information, physical address, operating hours, and access to products found at Defendant's Principal Place of Business. Defendant's Website acts as the digital extension of Defendant's Principal Place of Business providing the ability to browse and purchase merchandise through Defendant's Website provides an essential service for individuals like MYERS who face challenges traveling to Defendant's Principal Place of Business. By offering the option to subscribe to electronic communications for special offers, benefits, and exclusive discounts, Defendant's Website extends the shopping experience to MYERS's home environment. This digital accessibility is crucial, as MYERS, being visually disabled, may find in-person visits difficult and disorienting. However, Defendant's Website does not currently provide its business information in a format that is accessible for use by blind and visually impaired individuals using screen reader software, limiting its effectiveness in serving this demographic.

43.     Public accommodations under the ADA must ensure that their places of public accommodation provide effective communication for all members of the general public, including individuals with visual disabilities such as Plaintiff.

44.     The broad mandate of the ADA is to provide equal opportunity for individuals with disabilities to participate in and benefit from all aspects of American civic and economic life. That mandate extends to internet e-commerce websites such as the Defendant's Website.

45.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

46.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations, which is equal to the opportunities afforded to other individuals. 42 U.S.C. §12182(b)(1)(A)(ii).

47.     Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things: "a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage or accommodation being offered or would result in an undue burden." 42 U.S.C. § 12182(b)(2)(A)(ii)-(iii); see also 28 C.F.R. § 36.303(a).

48.     According to 28 C.F.R. §36.303(b)(1), auxiliary aids and services include "voice, text, and video-based telecommunications products and systems". Indeed, 28 C.F.R. §36.303(b)(2) specifically states that screen reader software is an effective method of making visually delivered material available to individuals who are blind or have low vision.

49.     Title III requires that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). The regulation sets forth numerous examples of "auxiliary

aids and services," including "...accessible electronic and information technology; or other effective methods of making visually delivered materials available to individuals who are blind or have low vision." 28 C.F.R. § 36.303(b). The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder. MYERS, who is blind and has disabilities that substantially limit the major life activity of seeing within the meaning of 42 U.S.C. §§ 12102(1)(A) and (2)(A), and has been denied full and equal access to Defendant's Website because of his disability. He has not been provided services that are provided to other patrons who are not disabled, and/or has been provided services that are inferior to the services provided to non-disabled persons. Defendant has failed to take the required prompt and equitable steps to remedy its discriminatory conduct. These violations are ongoing.

50. MYERS encountered barriers on each of MYERS' Website Visits. On or about March 13, 2025, MYERS initially attempted to access and/or utilize Defendant's Website, but was unable to, and he continues to be unable to enjoy full and equal access to Defendant's Website and/or understand the content therein because numerous portions of the Defendant's Website do not interface with MYERS's screen reader software. Specifically, features of Defendant's Website are inaccessible to MYERS' screen reader software, including, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

    **a.**    **Missing skip to content link**

        i. **Issue:** The absence of a 'Skip to Content' link on the website impedes both screen reader and keyboard-only users. This omission requires individuals to navigate through all the navigation items before accessing the main content, resulting in a tedious and frustrating browsing experience. This affects not only users who rely on screen readers but also those who depend on keyboard navigation due to motor disabilities.

        ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** Users with visual impairments and motor disabilities face significant challenges due to the missing 'Skip to Content' link. The necessity to traverse all navigational elements before reaching the main content leads to inefficiencies and frustration, severely impacting their ability to engage effectively with the website's core information.

b. **Menu items inaccessible for screen reader users**

i. **Issue:** The menu in the header section lacks the appropriate roles for 'menu' and 'menu items,' and menu items fail to expand when operated via keyboard. This deficiency makes it impossible for screen reader and keyboard-only users to comprehend and navigate the menu. The absence of correct roles prevents assistive technology from accurately announcing the menu structure, and the lack of keyboard support restricts users who rely on keyboard navigation from accessing submenu items.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A - Menubar Navigation

iii. **Impact:** The inaccessibility of menu items for screen reader users and keyboard-only users creates a barrier to understanding and navigating the website. Without accurate role definitions and keyboard operability, users are unable to interact with the menu effectively, denying them access to critical navigational pathways.

c. **Missing heading mark-up - H1**

i. **Issue:** The absence of an H1 heading on the page presents a barrier to screen reader users, who struggle to discern the page's structure. This omission complicates navigation and the ability to locate pertinent information.

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Headings

iii. **Impact:** Screen reader users encounter difficulties in understanding the page structure due to the missing H1 heading, hindering their ability to navigate and locate essential information efficiently. The absence of appropriate heading markup significantly impacts their browsing experience, leading to confusion and accessibility barriers.

d. **Heading structure within the page is not correct**

i. **Issue:** The page's heading structure is improperly organized, creating a barrier for screen reader users. For example, text such as 'Popular

dishes' and 'Stay at our RV Park' is marked as an H3 instead of an H2, and text such as 'Country Fried Round Steak' and 'BBQ Pork Steak' is marked as an H6 instead of an H3. This mislabeling confuses screen reader users, making it difficult to understand the page's hierarchy and navigate effectively.

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Headings

iii. **Impact:** The improper heading structure disrupts the ability of screen reader users to comprehend and navigate the page. This disorganization leads to confusion and necessitates additional effort to interpret the content hierarchy, impeding efficient navigation and access to information.

e. **Main Landmark Incorrectly Includes Header Region**

i. **Issue:** The main region erroneously includes the header region, causing confusion for screen reader users. The main landmark should be limited to the page's primary content, with the header as a distinct landmark. Incorrect nesting of the header within the main region complicates the ability of assistive technology users to differentiate between navigational and main content, hampering efficient page navigation.

ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

iii. **Impact:** Screen reader users experience confusion when the header region is improperly nested within the main region, as it complicates the distinction between navigation and primary content. This misclassification hinders their capacity to navigate the webpage effectively, resulting in an inefficient and frustrating user experience.

f. **Active Menu Item Not Programmatically Defined**

i. **Issue:** The currently active menu item is not programmatically defined, making it difficult for screen reader users to determine which menu item is selected. Without proper ARIA attributes, assistive technology cannot announce the active menu item, leading to confusion when navigating the site. Users may not know which section of the website they are currently on.

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Headings

iii. **Impact:** Visually impaired users, particularly those who are blind, may experience significant confusion and disorientation when navigating

the site. The absence of programmatically defined active menu items hinders their ability to understand which section of the website they are currently exploring, leading to a diminished user experience and possible frustration.

g. **Image of text**

i. **Issue:** The texts "Corn S D Baked", "Potato Salad E", etc., are shown as an image, creating a barrier for screen reader users. Since screen readers cannot interpret images, users relying on assistive technology are denied access to this important information. Consequently, they miss out on content that may be crucial for understanding the page, making it harder for them to fully interact with the site.

ii. **WCAG 2.1 AA Violations:** 1.4.5 - AA, 1.1.1 - A - Images Of Text

iii. **Impact:** Users with visual impairments, especially those who are blind, are unable to access essential text content because it is presented as an image. This exclusion from critical information severely hampers their ability to comprehend and engage with the website, leading to a suboptimal navigation experience and potential exclusion from important content.

51.     Defendant's Website was subsequently initially audited by Plaintiff's expert, Till Paris, on March 21, 2025, and who confirmed the access barriers that MYERS had initially encountered did, in fact, exist. The numerous access barriers found on Defendant's Website by Plaintiff's Expert during this initial audit are set forth in the Declaration of Till Paris, attached hereto as "Composite Exhibit 1". The contents of "Composite Exhibit 1" are incorporated herein by reference. These access barriers rendered Defendant's Website inaccessible to users who are blind and visually disabled, including MYERS.

52.     Although Defendant is charged with having knowledge of the violations, Defendant may not have actual knowledge of said violations until this Complaint makes Defendant aware of same.

53.     Here, however, MYERS, through counsel, did send a pre-suit communication informing of the barriers to access on March 26, 2025. As such, Defendant was on notice and yet still has failed to correct the barriers to access on Defendant's Website.

54.     On or about June 23, 2025, MYERS again attempted to access and/or utilize Defendants' Website, but again was unable to enjoy full and equal access to Defendants' Website and/or understand the content therein because numerous portions of Defendants' Website do not interface with MYERS' screen reader software. Specifically, features of Defendants' Website are inaccessible to MYER'S screen reader software, include, but are not limited to, the following (citing the WCAG 2.1 Level A and AA Guidelines and Conformance Levels):

      a.    **Missing Skip Link on the Page**

          i.  **Issue:** The web page lacks a "Skip to main content" link at its top, forcing keyboard and screen reader users to traverse repeated content blocks like navigation and headers upon each page load. This absence hinders efficient access to main content, especially for individuals with mobility impairments or those utilizing keyboard-only interaction.

         ii.  **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

        iii.  **Impact:** The lack of a "Skip to main content" link at the top of the page creates a significant barrier for keyboard and screen reader users, compelling them to repeatedly navigate through repetitive content such as navigation menus and headers. This inefficiency particularly affects users with mobility impairments or those dependent on keyboard-only interaction, obstructing their ability to promptly access essential content.

      b.    **Menu and Menuitem Roles Not Defined, Menuitems Not Expandable via Keyboard or Screen Reader**

          i.  **Issue:** The menu bar is improperly structured, lacking appropriate ARIA roles like role="menubar" for the container and role="menuitem" for each interactive component. Furthermore, when a menu item gains focus, it cannot be expanded via keyboard or other assistive input

methods, impeding users who depend on assistive technologies from perceiving, navigating, or interacting with the menu structure.

ii. **WCAG 2.1 AA Violations:** 4.1.2 - A, 2.1.1 - A - Menubar Navigation

iii. **Impact:** The absence of proper ARIA roles and functionality in the menu bar prevents users reliant on assistive technologies from effectively perceiving, navigating, or interacting with the menu. This lack of accessibility inhibits their ability to expand menu items, hindering interaction for those who rely on keyboard or assistive input methods.

c. **Hidden Checkbox Incorrectly Placed Between Menu Items**

i. **Issue:** An improperly positioned hidden checkbox between the "RV Parks" and "Sikeston, MO" menu items disrupts navigation for screen reader and keyboard users, causing confusion and an inaccessible navigation experience by interrupting the expected menu flow.

ii. **WCAG 2.1 AA Violations:** 2.4.3 - A, 4.1.2 - A - ARIA8

iii. **Impact:** The hidden checkbox disrupts the navigational flow between "RV Parks" and "Sikeston, MO" for screen reader and keyboard users, creating a confusing and inaccessible experience. This interruption in the expected menu navigation path prevents efficient interaction for users relying on these technologies.

d. **Missing heading level 1 on the page**

i. **Issue:** The page lacks a top-level <h1> heading element that is crucial for identifying the main subject or purpose of the page. Without an <h1>, screen reader users face challenges in promptly orienting themselves or confirming they are on the correct page, adversely affecting the document outline and structured navigation for all assistive technology users.

ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Headings

iii. **Impact:** Without a top-level <h1> heading, screen reader users struggle to ascertain the page's main topic or purpose upon arrival, hindering their ability to quickly orient themselves and confirm they are on the correct page. This deficiency disrupts the document's outline and adversely impacts structured navigation for all assistive technology users.

e. **Heading structure within the page is not correct**

    i. **Issue:** The page's heading structure is improperly formatted, impeding screen reader users from comprehending content hierarchy and navigating the page efficiently. Texts like "Popular dishes" and "Stay at our RV Park" are marked as <h3> instead of <h2>, and "Country Fried Round Steak" and "BBQ Pork Steak" are marked as <h6> instead of <h3>, resulting in a misaligned heading hierarchy.

    ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Headings

    iii. **Impact:** The incorrect heading structure, with misaligned levels, obstructs screen reader users' ability to understand and navigate the content hierarchy effectively. Properly structured headings are essential for facilitating content skimming and navigation, and this misalignment creates barriers for users who rely on such structured navigation to access information efficiently.

f. **Main Landmark Incorrectly Includes Header Region**

    i. **Issue:** The main landmark erroneously incorporates the header region, preventing screen reader users from effectively distinguishing between the primary content and the site's navigation or branding areas. This results in confusion and disrupts the logical reading and navigation sequence.

    ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

    iii. **Impact:** Screen reader users are unable to differentiate the primary content from navigation or branding sections, leading to confusion and disrupting the logical flow of information. This impairs their ability to navigate the website efficiently.

g. **Footer Landmark Missing and Footer Content Incorrectly Included in Main Section**

    i. **Issue:** The page lacks a defined footer landmark, and the footer content is improperly included within the main section. This prevents screen reader users from identifying the conclusion of the primary content and navigating seamlessly to the footer.

    ii. **WCAG 2.1 AA Violations:** 2.4.1 - A - Bypass Blocks

    iii. **Impact:** Without a distinct footer landmark, screen reader users face challenges in recognizing where the main content ends and have

difficulty accessing the footer, resulting in a perplexing navigation experience.

h. **Current Page Not Defined for Navigation Link**

    i. **Issue:** The navigation link does not specify the current page, leaving screen reader users unable to ascertain their current location within the website structure. The absence of the aria-current attribute leads to confusion regarding the active page.

    ii. **WCAG 2.1 AA Violations:** 1.3.1 - A - Headings

    iii. **Impact:** Screen reader users cannot determine which page they are on, leading to confusion about their current position within the website. This lack of clarity hinders efficient navigation.

i. **Use of Images of Text for Important Information**

    i. **Issue:** Crucial information is conveyed through images of text instead of actual text, impeding access for screen reader users. Should images fail to load, essential messages are entirely inaccessible.

    ii. **WCAG 2.1 AA Violations:** 1.4.5 - AA, 1.1.1 - A - Images Of Text

    iii. **Impact:** Screen reader users are unable to perceive essential information embedded in images of text, creating significant barriers to understanding and navigating the website's content.

55.     Additionally, MYERS' expert again audited Defendant's Website on June 24, 2025, and again confirmed the access barriers that MYERS encountered do in fact exist. Mr. Paris determined the issues with the website persist and these persistent issues would be a barrier to individuals with low to no vision. Mr. Paris performed a Re-Test Audit based on this June 24, 2025 evaluation. The identified access barriers found on Defendant's Website by Plaintiff's Expert during this June 24, 2025. Evaluation are further set forth in "Composite Exhibit 1."

56.     More violations may be present on Defendant's Website, which can and will be determined and proven through the discovery process in this case.

57.     There are readily available, well-established guidelines on the internet for making websites accessible to the blind and visually disabled. These guidelines have been followed by other large business entities in making their websites accessible. Incorporating such basic components to make Defendant's Website accessible would neither fundamentally alter the nature of Defendant's business nor would it result in an undue burden to the Defendant.

58.     Defendant thus has failed to make reasonable modifications in its policies, practices, or procedures when such modifications are necessary to afford goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, in violation of 28 C.F.R. §36.302.

59.     To the best of Plaintiff's belief and knowledge, Defendant has failed to eliminate the specific violations set forth in paragraphs 50, 51, 54 and 55 herein. As a result, Defendant has violated the ADA -- and continues to violate the ADA -- by denying access to Defendant's Website by individuals, such as MYERS, with visual disabilities who require the assistance of interface with screen reader software to comprehend and access internet websites. These violations within the Defendant's Website are ongoing.

60.     As a direct and proximate result of Defendant's failure to provide an ADA compliant Website, with a nexus to its Defendant's Principal Place of Business, Plaintiff has suffered an injury in fact by being denied full access to and enjoyment of Defendant's Website and Defendant's Principal Place of Business.

61.     Because of the inadequate development and administration of the Defendant's Website, MYERS is entitled to injunctive relief pursuant to 42 U.S.C. §12133 and 28 C.F.R. §36.303, to remedy the ongoing disability discrimination.

62. Enforcement of MYERS' rights under the ADA is right and just pursuant to 28 U.S.C. §§2201 and 2202.

63. MYERS has retained the undersigned counsel for the pursuit, filing and prosecution of this action. MYERS is entitled to have his reasonable attorneys' fees, costs and expenses paid by Defendant, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505.

64. Pursuant to 42 U.S.C. §12188, this Court is vested with the authority to grant MYERS appropriate and necessary injunctive relief; including an order to:

    a.    Require Defendant to adopt and implement a web accessibility policy to make publicly available and directly link from the homepage of Defendant's Website to a statement as to the Defendant's policy to ensure persons with disabilities have full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations through Defendant's Website.

    b.    Require Defendant to take the necessary steps to make Defendant's Website readily accessible to and usable by visually disabled users, and during that time period prior to Defendant's Website's being readily accessible, to provide an alternative method for individuals with visual disabilities to access the information available on Defendant's Website until such time that the requisite modifications are made, and

    c.    Require Defendant to provide the appropriate auxiliary aids such that individuals with visual impairments will be able to effectively communicate with Defendant's Website for purposes of viewing and locating Defendant's Principal Place of Business, and becoming informed of and purchasing Defendant's offerings online, and during that time period prior to Defendant's Website's being designed to permit individuals with visual disabilities to effectively communicate, to provide an

alternative method for individuals with visual disabilities to effectively communicate for such goods and services made available to the general public through Defendant's Website.

WHEREFORE, MYERS requests entry of judgment in his favor and against Defendant for the following relief:

A.     A declaration that Defendant's Website is in violation of the ADA;

B.     An Order requiring Defendant, by a date certain, to update Defendant's Website, and continue to monitor and update Defendant's Website on an ongoing basis, to remove barriers in order that individuals with visual disabilities can access, and continue to access, Defendant's Website and effectively communicate with Defendant's Website to the full extent required by Title III of the ADA;

C.     An Order requiring Defendant, by a date certain, to clearly display the universal disabled logo within Defendant's Website, wherein the logo would lead to a page which would state Defendant's accessibility information, facts, policies, and accommodations. Such a clear display of the disabled logo is to ensure that individuals who are disabled are aware of the availability of the accessible features of Defendant's Website;

D.     An Order requiring Defendant, by a date certain, to provide ongoing support for web accessibility by implementing a website accessibility coordinator, a website application accessibility policy, and providing for website accessibility feedback to ensure compliance thereto;

E.     An Order directing Defendant, by a date certain, to evaluate its policies, practices and procedures toward persons with disabilities, for such reasonable time to allow

Defendant to undertake and complete corrective procedures to Defendant's Website;

F.      An Order directing Defendant, by a date certain, to establish a policy of web accessibility and accessibility features for Defendant's Website to ensure effective communication for individuals who are visually disabled;

G.      An Order requiring, by a date certain, that any third-party vendors who participate on Defendant's Website to be fully accessible to the visually disabled;

H.      An Order directing Defendant, by a date certain and at least once yearly thereafter, to provide mandatory web accessibility training to all employees who write or develop programs or code for, or who publish final content to, Defendant's Website on how to conform all web content and services with ADA accessibility requirements and applicable accessibility guidelines;

I.      An Order directing Defendant, by a date certain and at least once every three months thereafter, to conduct automated accessibility tests of Defendant's Website to identify any instances where Defendant's Website is no longer in conformance with the accessibility requirements of the ADA and any applicable accessibility guidelines, and further directing Defendant to send a copy of the twelve (12) quarterly reports to Plaintiff's counsel for review;

J.      An Order directing Defendant, by a date certain, to make publicly available and directly link from Defendant's Website's homepage, a statement of Defendant's Accessibility Policy to ensure the persons with disabilities have full and equal enjoyment of Defendant's Website and shall accompany the public policy

statement with an accessible means of submitting accessibility questions and problems;

K.     An award to Plaintiff of his reasonable attorney's fees, costs, and expenses; and

L.     Such other and further relief as the Court deems just and equitable.

Dated: August 12, 2025                                    Respectively submitted,


**ADA LEGAL TEAM, LLC**

/s/ Kevin W. Puckett
Kevin W. Puckett                    #70706(MO)
4700 Belleview Avenue, Suite 100C
Kansas City, Missouri 64112
Phone: (816) 890-9599
Facsimile: (816) 203-8590
Email: kevin@ADALegalTeam.com

**ATTORNEY FOR PLAINTIFF**